**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Timothy D. LAUGHLIN and Larry D.
Trout, Defendants-Appellants.**

Nos. 84–2345, 84–2346.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 24, 1985.

Decided Sept. 5, 1985.

Michael C. Carr, Asst. U.S. Atty., Benton, Ill., for plaintiff-appellee.

Robert H. Rice, Rice Law Offices, Ralph J. Derango, Jr., Jones, Ottesen, Feickert & Derrango, Belleville, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, CU-DAHY, Circuit Judge, and PELL, Senior Circuit Judge.

PELL, Senior Circuit Judge.

On May 29, 1984, a jury convicted defendants-appellants Timothy Laughlin and Larry Trout of various drug charges. Specifically, Counts 1 and 3 of the indictment charged another individual, Kent Worthall, with distribution of cocaine on two separate occasions, February 9, 1984, and March 14, 1984, in violation of 21 U.S.C. § 841(a)(1). Counts 1 and 3 charged defendant Laughlin with aiding and abetting the distribution of cocaine on both of these occasions, while Count 1 charged defendant Trout with aiding and abetting the distribution of cocaine on March 14th. Count 2 charged Worthall and defendants Laughlin and Trout with conspiracy to possess with intent to distribute cocaine on March 14th in violation of 21 U.S.C. §§ 841(a)(1) and 846. Prior to trial, Worthall entered into a plea agreement with the Government whereby he agreed to testify in return for the Government's promise to drop two of the three charges against him. A jury convicted defendants Laughlin and Trout of all of the charges brought against them in the indictment. They appeal their convictions.

## I. The Facts

On February 7, 1984, Special Agent Michael Geurin of the Illinois Department of Criminal Investigation, while working in an undercover capacity, arranged to purchase one-eighth of an ounce of cocaine from Worthall. They arranged for the sale to occur on February 9, 1984, in a parking lot behind a tavern in Flora, Illinois.

Accompanied by two agents who conducted surveillance, Geurin arrived at the parking lot on February 9th at about 3:00 p.m. Worthall arrived shortly thereafter and informed Geurin that he did not have the cocaine and that they would have to wait fifteen or twenty minutes. At this point, Worthall went inside the tavern. After returning from the tavern, Worthall got into Geurin's car. While they were waiting in the car, Worthall showed Geurin a large roll of money, which he claimed was $3,600, and told him that he was going to give the money to "Tim." A few minutes later, Geurin observed a black Trans Am arrive in an alley next to the parking lot. Worthall said, "There's Tim" and asked Geurin for $325, the agreed-upon price for the cocaine. Worthall exited Geurin's car and got into the Trans Am with the driver of the car. After about eight minutes, Worthall got out of the Trans Am, returned to Geurin's car, and gave him the cocaine.

With respect to this transaction, Worthall testified that, when he went inside the tavern, he called Laughlin, who was his source for the cocaine. He was informed that Laughlin was on his way. Worthall further testified that Laughlin was the driver of the Trans Am and that he obtained the cocaine from Laughlin. Corroborating Worthall's testimony, Agent Sylvester, one of the agents who conducted surveillance and followed the Trans Am to a nearby convenience store, identified Laughlin at trial as the driver of the car.

At trial, Worthall and Geurin also testified about another cocaine transaction, for which neither Worthall nor defendants were charged, that occurred on February 16th in the same parking lot in Flora, Illinois. On that date, Worthall arrived at the parking lot with defendant Trout in Trout's car. As before, Worthall left Trout's car and got into Geurin's car. In the car, Worthall delivered the previously arranged one-half ounce of cocaine, and Geurin paid him $1,125. Worthall then returned to Trout's car, in which he remained for about eight minutes. Then, Worthall exited Trout's car, entered the tavern, and Trout drove away. Worthall testified that he arranged with Laughlin for Trout to deliver the half-ounce of cocaine and that he agreed with Laughlin to pay Trout $1,025 upon the sale.

Worthall's final sale of cocaine to Geurin occurred on March 14, 1984. According to Geurin, a few days earlier, he arranged to purchase two ounces of cocaine from Worthall for $4,200. On the 14th, Geurin ar-

rived at Worthall's residence at about 2:00 p.m., whereupon Worthall told him that he did not have the cocaine. Because Worthall did not have a telephone in his residence, Geurin drove Worthall to the tavern so that Worthall could make phone calls to arrange the deal. After making the calls, Worthall told Geurin to meet him at Worthall's residence at 4:00 p.m. to obtain the cocaine.

Geurin returned to Worthall's residence at 4:00 p.m., and a man informed him that Worthall was not at home but that "the package [was] in." A short time later, Geurin learned over his police radio that a green Monte Carlo had arrived at Worthall's residence. Geurin saw the car, later identified as Trout's girl friend's car, as it was leaving Worthall's residence. Worthall waved Geurin over to the side of the road and approached his car. Worthall got into Geurin's car and informed him that he had obtained the two ounces of cocaine. In addition, he told Geurin that the driver of the Monte Carlo was the person who brought the drugs from a neighboring town. At this point, Worthall instructed the driver of the Monte Carlo to return to Worthall's residence and wait for him. Geurin and Worthall then drove a short distance, and, after a few minutes, Geurin pulled over. Worthall showed Geurin the cocaine, at which point two other agents arrived and identified themselves. Wanting to cooperate, Worthall informed the agents that he had arranged the attempted transaction through Laughlin. According to the plan, Trout was to obtain the cocaine and pay Laughlin $4,000 from the sale.

After giving the agents this information, Worthall and Geurin drove back to Worthall's residence, and Worthall motioned to Trout, who was sitting in the Monte Carlo, to follow Geurin's car. They drove a distance of approximately two blocks and then pulled over in a softball field. At that point, Geurin and the other agents arrested Trout.

At trial, Worthall confirmed that he had arranged with Laughlin the specifics of the March 14th transaction. Worthall testified that, during the afternoon of the 14th, he met Trout, who already had obtained the cocaine, in Clay City, a neighboring town to Flora. Then, they drove to a house where they diluted the cocaine with B-12, a vitamin supplement, and returned to Flora. Upon their return to Flora, they were apprehended in the manner previously set forth.

The agents arrested Laughlin that evening at about 7:00 p.m. at his house. At about 10:30 that evening, a number of agents searched Laughlin's house pursuant to a search warrant. They found, among the items in Laughlin's house, a pipe and a bong used to smoke marijuana, a gram scale, $870 in cash, and a number of possibly inculpatory photographs.

At the trial, the jury convicted both defendants of the charges alleged in the indictment. The judge sentenced Laughlin to a seven-year term of imprisonment for each of the three counts on which he was convicted, the terms to run concurrently. In addition, Laughlin received a special parole term of three years on Counts 1 and 3, the aiding and abetting charges. The judge sentenced Trout to a three-year term of imprisonment for each of the two counts on which he was found guilty, with the terms to run concurrently with one another. Similarly, Trout received a special parole term of six years on Count 1.

Both Trout and Laughlin appeal their convictions on a number of grounds. First, Trout contends that the Government violated his Fifth and Sixth Amendment rights when Agent Moomaw testified to a statement that Trout made after receiving *Miranda* warnings, at which time he stated that he wanted to see an attorney. Second, Trout complains that the Government violated his Fourteenth Amendment right to due process by cross-examining him about his failure to make certain exculpatory statements at the time of his arrest and by commenting upon his post-arrest silence during closing argument.

Both defendants challenge the trial court's decision to admit certain photographs that the agents found in Laughlin's

house, and Trout challenges the court's decision to admit the pipe and the bong that the agents also found in Laughlin's house. In addition, Laughlin and Trout claim that the court erred when it allowed Agent Stites to impeach Laughlin's wife's testimony by testifying that she previously told him that Ed Kish was the source of her husband's cocaine. Finally, Laughlin contends that the court should have permitted Trout to testify that he did not overhear a statement that Worthall claimed Laughlin made while the three of them were in jail following their arrest.

## II. Trout's Arrest

### A. Trout's Spontaneous Inculpatory Statement

■ At trial, Agent Moomaw testified that, after he arrested Trout and advised him of his *Miranda* rights, he transported him to a holding facility. According to Moomaw, while they were on their way to this holding facility, Trout stated, "I almost took off." To this, Moomaw replied, "What do you mean?" Trout again stated, "When I saw you pull up behind me, I almost took off." Moomaw then asked, "You know a chase would have ensued?" According to Moomaw, Trout shrugged his shoulders.

Prior to permitting Moomaw to testify about Trout's statements, the court conducted a hearing on Trout's motion to suppress the statements. Trout did not testify at this hearing. Rather, Moomaw was the only witness, and he testified that, after he gave Trout his *Miranda* warnings and Trout stated that he wanted an attorney before answering any questions, Trout spontaneously made the statement that he almost took off. Moomaw testified that, prior to this statement, he had not asked Trout any questions once Trout invoked his *Miranda* rights. Based on this testimony, the court found that Trout's statement, "I almost took off," was spontaneous and that the follow-up exchange did not constitute interrogation.

Trout did not testify at the suppression hearing although he did take the witness stand in the trial itself and testified that he did not make any statements, including the ones to which Moomaw testified. If, of course, he had testified at the suppression hearing, a credibility question would have been presented to the court but, in the absence of that, we cannot find clearly erroneous the district court's determination that Trout's initial statement was spontaneous and not a response to custodial interrogation. *See United States v. Rodgers,* 755 F.2d 533, 546 (7th Cir.1985). Therefore, the court did not violate Trout's Fifth Amendment rights by permitting Moomaw to testify to this statement. *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966).

The happenings in this case are contrary to the usual situation where a defendant will testify in a suppression hearing because he can do so without waiving his Fifth Amendment rights but where he probably would be unwilling to controvert a particular fact in the trial on the merits because of the waiver involved and possible impeachment by other evidence which could have a bearing on the ultimate issue of his guilt. Nevertheless, Trout chose here not to testify and Moomaw's testimony unrebutted in the suppression hearing clearly supports the finding that the statement was spontaneous.

■ Additionally, this court finds of no significance the question whether the trial court erred in deciding that Moomaw's follow-up questions did not constitute interrogation. *See Rhode Island v. Innis,* 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("The definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."). Under the circumstances of this case, this court declines to address that question because any harm that resulted from the admission of Trout's responses to Moomaw's questions was inconsequential and, therefore, harmless. *See* Fed.R.Crim.P. 52(a). After all, the only other statement that Trout made—that when he saw Moomaw pull up

behind him, he almost took off—was essentially duplicative of his first statement, which was admissible. In addition, Trout's action of shrugging his shoulders was an ambiguous gesture and not a "statement" for purposes of the Fifth Amendment right against self-incrimination.

### B. Trout's Post-Arrest Silence

Trout argues that this court must reverse his conviction because the Government violated his due process rights by impermissibly cross-examining him about and commenting upon his failure to make exculpatory statements after his arrest. According to the Government, however, the prosecutor's conduct on cross-examination and in closing argument did not amount to reversible error because, inter alia, the defense had "opened the door," during its cross-examination of Agent Geurin, for the Government to examine the issue of Trout's post-arrest silence.

This brings into play *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In that case, the Supreme Court first enunciated the general rule that the Government may not "impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." *Id.* at 611, 96 S.Ct. at 2241–42. The Court concluded, for two reasons, that the Government violates a defendant's due process rights by commenting upon his post-arrest silence. First, the Court noted that a defendant's silence in response to *Miranda* warnings is "insolubly ambiguous." *Id.* at 617, 96 S.Ct. at 2244. Second, the Court found that, by giving *Miranda* warnings, the Government implicitly assures a defendant that he will not be penalized for exercising those rights by remaining silent. *Id.* at 618, 96 S.Ct. at 2245.

■ Despite the general prohibition against the Government's use of a defendant's post-arrest silence for impeachment purposes, however, the Supreme Court made clear in *Doyle* that the rule contains exceptions. For example, the rule would not apply where a defendant testifies at trial that he told his exculpatory story at the time of his arrest. *Id.* at 619–20, n. 11, 96 S.Ct. at 2245–46, n. 11. In that situation, the Government may introduce defendant's post-arrest silence to impeach his claim that when he was arrested he did not remain silent but told his exculpatory story. *Id.* Other courts have spelled out further exceptions to the *Doyle* rule and the Government has endeavored to find some support in several of these exceptions.

■ Before examining these exceptions, however, we turn to the precise scenario that was involved in this case to determine whether there was a violation of the *Doyle* rule requiring reversal in this case. The issue arose out of the final sale of cocaine to Geurin on March 14. The Government contended that Trout was present on that occasion to receive the $4,000 payment from Worthall for the sale, which payment Trout would then turn over to Laughlin. Trout's theory, as it was developed during trial, was that he was merely present at the transaction to receive a $200 loan payment from Worthall for Laughlin. As set forth earlier in this opinion, Worthall had motioned to Trout to follow Geurin's car. As soon as Trout pulled up behind Geurin's car at the athletic field the agents identified themselves and arrested him. Agent Moomaw advised Trout of his constitutional rights via a form of a *Miranda* warning. There has been a previous reference to statements Trout made to Moomaw en route to the holding facility and it is only indirectly involved in the testimony relating to the events of the March 14th transaction as bearing on the *Doyle* issue.

During the initial cross-examination, Agent Geurin's repeated attention was directed to the fact that the agents did nothing inconsistent with the theory to be developed by Trout that he was not there to get $4,000 but merely to collect the $200. This colloquy then took place:

Q. Okay, you didn't hand him the $4,000 and when he took it, press your button?

A. No, sir.

Q. Okay. My client did not admit at the scene that he was expecting $4,000, did he?

A. No.

Q. Did you say to him, "We have your $4,000"?

MR. CARR: [Government counsel] Your Honor ...

MR. DERANGO: At any time?

The Government objected on the ground that the questions would inaccurately imply that Trout was cooperative when, in fact, he had immediately asserted his rights after having the *Miranda* rights warnings read to him, which had occurred as soon as the car came to a halt and the arrest was made. The court advised defense counsel to confine his questions to a time before the arrest and that if he went beyond that, "you are warned on the record that you are opening the door." Thereafter, although referring to the time prior to the arrest, the line of questioning was again pursued that there was no attempt made to offer $4,000. The same line of questioning was pursued with Agent Moomaw on cross-examination. The following were some of the questions that were asked on that occasion:

Q. Was there any discussion among the agents after the arrest of Trout and the conversation with him about his cooperation and so on, was there any discussion among any of you regarding leading Trout to the ball diamond and having anyone offer him the $4,000.00 that Worthall claimed he was waiting for?

Q. Then you didn't have to test Trout to see if he accepted $4,000.00 as his?

Q. Somebody misconstrue it, if Trout said, "I don't have $4,000.00 coming. Why are you handing me this money?" Could he not?

Q. That could be construed as a sign of Trout's innocence, couldn't it?

Q. Trout refusing $4,000.00 or indicating that the four thousand was noth-ing that he expected to receive could indicate that Worthall was lying and Trout was innocent, couldn't it?

Later in the cross-examination again the implication was made that Trout was not given the opportunity to explain why he was there. We will not comment on what the purpose might have been but the obvious effect on the jury was to convey the impression that, during the period when the arrest occurred, Trout simply was not given the opportunity to proclaim his innocent involvement.

When Trout took the witness stand, he testified in effect that he was picking up money from Worthall for the defendant Laughlin because Worthall owed Laughlin on a loan. He was then asked about the statement he had made on the way to the holding facility:

Q. You have heard his testimony that you made a statement to him that you almost took off?

A. Yes, and I didn't make no statement of any kind.

It was following up in the context of this background, particularly that he didn't make a statement of any kind, that the cross-examination challenged under the *Doyle* rule occurred:

Q. You just testified that after you were arrested, you didn't make a statement of any kind, isn't that right?

A. That is right.

Q. So Moomaw, what he said was incorrect?

A. That is true.

Q. You didn't make any statement?

A. I didn't make any statement.

Q. You didn't tell the police officers who had just arrested you that you thought [Worthall] was dealing in dope?

A. No, I didn't tell the police officer nothing.

Q. You didn't tell him that you were going to pick up an amount of mon-

ey for your friend Tim Laughlin when you were arrested?

A. No, sir.

Q. You didn't tell them that you had been on the 16th to pick up money for your friend Tim Laughlin?

A. No, sir.

Q. 'I thought I was being set up. Just the way he acted was hyper.' Did you tell anyone that?

A. No.

There was no objection to this line of questioning.

During closing argument, the Government again drew attention to Trout's failure to exculpate himself. The prosecutor argued:

He testified here that he thought that [Worthall] may be into some dope. Did he tell the officer that? He said, no, he didn't make any statements. Did he tell the officer that he was going to get into the four thousand—was going to bring in a loan of money? He told them, no, he didn't tell them anything.

Trout objected for the first time at this point, claiming that this argument was "improper, prejudicial" and that he "[was] not obliged to say anything when he [was] approached in a hostile manner and arrested." Instead of ruling on Trout's objection, however, the judge instructed the jury "to draw upon their memory and recollection as to what the evidence is and that will control." While the Government on this appeal has endeavored to fit its case within some of the several exceptions to the applicability of the *Doyle* rule, the fitting does not quite come off upon examination of those exceptions.

Various lower courts, including this circuit, have recognized an exception to *Doyle* where a defendant implies that, after his arrest, he cooperated with law enforcement officials by conversing with them about the circumstances of the crime. *See, e.g., United States v. Shue,* 766 F.2d 1122, 1129 (7th Cir.1985) (*Doyle* not applicable where defendant testified that after his arrest he cooperated with the authorities by giving fingerprint, hair, and handwriting samples and by appearing in lineups); *United States v. Allston,* 613 F.2d 609, 611 (5th Cir.1980) (*Doyle* not applicable where defendant testified that upon his arrest he told officers the same story that he offered at trial); *United States v. Dixon,* 593 F.2d 626, 630 (5th Cir.1979) (*Doyle* not applicable where defendant testified that he had spoken to the authorities four or five times), *cert. denied,* 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82. *But see Stone v. Estelle,* 556 F.2d 1242, 1244 (5th Cir.1977) (*Doyle* applies where defendant testified that he was on his way to the courthouse to turn himself in and cooperate with law enforcement officials when they arrested him), *cert. denied,* 434 U.S. 1019, 98 S.Ct. 742, 54 L.Ed.2d 767 (1978).

Unlike the facts of these cases, however, defendant in this case never testified that he told the agents anything following his arrest or that he cooperated with the authorities in any other way following his arrest. Thus, the most that can be said is that there was an implication during the course of the cross-examination of the agents and the testimony of Trout that his cooperation was prevented by his immediate arrest upon which he did not have the opportunity to state his case. The cooperation exception, *per se,* is not sufficiently made out even under the Government's characterization of Trout's implication that had the agents offered him the $4,000 he would have known that something was awry and would have explained that he had expected only $200 and that this failure to offer him the larger amount prevented his stating what the real situation was, i.e., he was merely collecting a small loan.

This case perhaps borders on a situation similar to that in *United States v. Mavrick,* 601 F.2d 921 (7th Cir.1979), but there the defendant had responded that he tried to give his exculpatory story to the officers when they arrested him, but they told him to "shut up" and "they didn't want to hear it." Nevertheless, the continued line of questioning about the failure of the agents to offer the $4,000 or even to mention it

raised the implication to the jury that, if they accepted Trout's innocent version, he would have had no reason for realizing that anything was other than he contended it to be.

Likewise, we do not regard another approach of the Government to be in and of itself significant and that is that Trout, by saying that he almost took off, broke his silence and, therefore, the rule against using post-arrest silence for impeachment purposes was no longer applicable. This possible exception could be based upon *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (per curiam), where the Supreme Court held that *Doyle* does not apply where the defendant, at the time of his arrest, gave an exculpatory version of the challenged events that was inconsistent with the version that he offered at trial. *Id.* at 409, 100 S.Ct. at 2182. *Accord Hockenbury v. Sowders*, 718 F.2d 155, 158–59 (6th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2354, 80 L.Ed.2d 826 (1984); *United States v. Samples*, 713 F.2d 298, 304 (7th Cir.1983). In *Anderson*, the Government tried to prove that the defendant was guilty of murder by relying, in part, upon the fact that defendant was arrested while driving the victim's car. When a detective questioned him after his arrest, the defendant told him that he had stolen the automobile from a location different from the location from which, at trial, he claimed that he stole it. Finding permissible the prosecution's cross-examination of defendant concerning his post-arrest statements, the Court reasoned that the Government "ma[de] no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Id.* at 408, 100 S.Ct. at 2182. In *Anderson*, the Court distinguished *Doyle* on the ground that the defendants in *Doyle* "made no post-arrest statements about their involvement in the crime." *Anderson*, 447 U.S. 407, 100 S.Ct. 2181–82. The present case, of course, is weaker than *Anderson*. The statement about taking off would not directly implicate Trout in the narcotics transaction that was just about to take place, but, of course, on the other hand, an intention to flee from the scene is the basis for an inference of knowledge of being personally involved in an illegal transaction. It seems reasonable to believe that a person who was present merely to collect a $200 loan for another person would be disinclined to take off when he became aware that law officers were at the scene. Again we must recognize that this exception in itself might not be a sufficient foundation to justify, without the other factors existing here, deviation from the application of the *Doyle* rule. It is further recognized that this particular justification for the cross-examination and later comments thereon were somewhat further weakened by the fact that Trout did not break his silence until the several-mile drive to the holding facility.

This court has enunciated another exception to *Doyle* in *United States ex rel. Saulsbury v. Greer*, 702 F.2d 651 (7th Cir. 1983), *cert. denied*, 461 U.S. 935, 103 S.Ct. 2104, 77 L.Ed.2d 310 (1983), the facts of which have some resemblance to the facts of this case. In *Saulsbury*, the defendant testified on direct examination that, when he was arrested, he remained silent and did not offer his exculpatory story. *Id.* at 652. In addition, he testified about the reasons that he remained silent. *Id.* Because the defendant "initiated the inquiry" into his post-arrest silence, *id.* at 655, this court held that the prosecutor did not violate *Doyle* by cross-examining the defendant about the reasons that he exercised his rights. *Id.* at 655–56. According to this court, the prosecutor's conduct did not contravene the *Doyle* rule because

> [t]he defendant was not content to leave [his silence] to what the jury might infer, without help from anyone. The direct examination, by assigning a reason for silence, had probative weight and removed that subject from the realm of insoluble ambiguity about which there could be no comment. Having ventured that far, the defense could not erect a constitutional barrier against the state

exploring the soundness of that explanation. . . .

*Id.* at 656.

In the case at bar, Trout simply stated on direct examination that he made no statement to Agent Moomaw when Moomaw arrested him. Defense counsel elicited this statement from Trout in response to Agent Moomaw's testimony that Trout made an inculpatory statement on the way to the holding facility. Therefore, unlike the defendant in *Saulsbury,* Trout did not "initiate the inquiry" into his post-arrest silence. Again, the present case is somewhat weaker for a *Doyle* exception than in *Saulsbury.* In that case, the defendant had initiated the inquiry by testifying about his reasons for remaining silent at the time of the arrest. Here there was no such direct testimony but, again, as a factor in the overall consideration of the issue, Trout's extended cross-examination of the officers carried the implication that he would have been prompted to expostulate if he had suddenly found that he was being tendered $4,000 instead of that which he claims he anticipated, $200.

The final factor which enters into our ultimate determination that Trout is not entitled to *Doyle* protection is the fact that he permitted the challenged cross-examination to go on and be completed without any objection whatsoever. It is true that during the closing argument, when there was reference made to this challenged evidence, there was an objection. This has all the aspects of sandbagging or playing games with justice. While an important constitutional right should not be lost simply because of a trial tactic, when all of the factors to which we referred here are taken together, the totality of the picture convinces us that Trout was not denied his Fourteenth Amendment rights of due process. Whatever scintilla of doubt might be remaining on the question of whether there was a constitutional violation, it is clear from our examination of the record that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

*Cf. Shue,* 766 F.2d at 1132–33. The Government's evidence overwhelmingly demonstrates that Trout's role on both February 16 and March 4 was to act as a conduit for the sale of cocaine between Laughlin and Geurin. Briefly summarized, Worthall testified to Trout's deliveries on two occasions. This testimony was corroborated by agents who saw Worthall get out of Trout's car on both occasions. Trout left the residence of Laughlin and met Worthall after Worthall had called Laughlin to set up the March 14 purchase. Finally, the inculpatory statement was made by Trout that he almost took off upon seeing the police. Therefore, we hold that the conduct of the prosecution with respect to the matters under consideration did not constitute reversible error.

### III. Admission of Evidence Seized from Laughlin's House

Defendants claim that the district court erred in admitting certain evidence that was seized from Laughlin's home pursuant to a search warrant. Specifically, both defendants contend that the court should not have admitted certain four-year old photographs, which were found within two pages of one another in a photograph album in Laughlin's house. These photographs depict Laughlin and Worthall smoking marijuana, Laughlin standing amid some marijuana plants, and the presence of a large sum of cash spread on the floor in fanned stacks. Additionally, Trout argues that the court erred in permitting the Government to introduce a pipe and a bong that were also found in Laughlin's home.

■ On appeal, defendants claim that the court should not have admitted these photographs because they constituted evidence of prior crimes. Under the Federal Rules of Evidence, prior crime evidence is inadmissible to show defendant's propensity to commit crimes but may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). *See United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984). At trial, however, defendants did not object to the

admission of the photographs on this ground; rather, they claimed that the photographs were not relevant and that, even if they were, they were unduly prejudicial. Because defendants failed at trial to raise rule 404(b) as a possible bar to the admissibility of the photographs, defendants have waived that objection on appeal. *United States v. Hickerson,* 732 F.2d 611, 613.(7th Cir.1984) (failure to object at trial operates as waiver unless admission constitutes plain error), *cert. denied,* —— U.S. ——, 105 S.Ct. 159, 83 L.Ed.2d 95. For this reason, this court will review only the district court's decisions that the photographs were relevant and that their prejudicial effect did not outweigh their probative value.

■ According to the Federal Rules of Evidence, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. According to the decisions of this court, a trial court possesses broad discretion in determining the relevance of proffered evidence, and its decision will not be disturbed on appeal absent a clear showing that the court abused its discretion. *United States v. Green,* 735 F.2d 1018, 1026 (7th Cir.1984); *United States v. Solomon,* 688 F.2d 1171, 1178 (7th Cir.1982).

■ At trial, the Government argued that the photographs were relevant because they tended to show that Laughlin was involved in the business of dealing in narcotics. Because Laughlin's wife testified that Laughlin used drugs for recreational purposes, the Government was entitled to introduce evidence to demonstrate that Laughlin did not simply use drugs but that he also dealt in narcotics for profit. Thus, this court must decide whether the trial court abused its discretion in determining that these photographs tended to prove that Laughlin dealt in narcotics for profit.

Recognizing that we should accord deference to a district court's ruling on relevancy, this court finds that the court did not abuse its discretion in finding relevant the photographs of Laughlin and a companion outside in the presence of marijuana plants and the photograph of the large supply of cash. With respect to the photograph of cash, although neither Laughlin nor any narcotics are pictured with the money, that this picture was displayed in a photograph album among many other photographs showing Laughlin in the presence of drugs tends to prove that this cash was connected with the sale of drugs. That Laughlin does not appear in the picture may diminish the weight of the evidence but does not destroy its relevance.

In addition, even though the photographs of Laughlin and a companion in the presence of marijuana plants show them surrounded by marijuana and not cocaine, the drug involved in this case, we find that the trial court did not abuse its discretion in admitting these pictures. At trial, Laughlin's wife testified that Laughlin used drugs, including marijuana, for recreational purposes. That these pictures demonstrate that Laughlin had access to a large amount of marijuana tends to show that Laughlin may have been in the business of selling narcotics. This evidence also tends to discredit Laughlin's wife's testimony that, while Laughlin may have used drugs recreationally, he did not distribute them for profit.

Finally, regarding the pictures of Laughlin, Worthall, and another companion using marijuana, this court finds that the district court abused its discretion in determining that these pictures were relevant. Unlike the other pictures, these pictures do nothing more than corroborate Laughlin's wife's testimony that her husband used drugs for recreational purposes. They have no probative value concerning any disputed issue that was before the court in this case. Although the court abused its discretion by admitting these photographs, the error was harmless. *See* Fed.R. Crim.P. 52(a). The photographs simply constituted cumulative evidence and, thus, did not cause any material harm.

■ Defendants also objected to the admission of the photographs on the ground that their prejudicial effect substantially outweighed their probative value. Fed.R. Evid. 403. As with the issue of relevancy, the trial court possesses wide discretion to weigh the probative value of proffered evidence against its prejudicial effect. *United ed States v. Levy,* 741 F.2d 915, 924 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 440, 83 L.Ed.2d 366; *United States v. Harris,* 542 F.2d 1283, 1317 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). A reviewing court should not reverse a rule 403 determination unless it constitutes a clear abuse of the discretion vested in the trial court. *United States v. Weston,* 708 F.2d 302, 308 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 397, 78 L.Ed.2d 340. In this case, considering the Government's need to rebut defendant's contention that he used drugs only for recreational purposes and considering that under rule 403 "the balance should be struck in favor of admissibility," *United States v. Dennis,* 625 F.2d 782, 797 (8th Cir.1980), this court finds that the district court did not abuse its discretion in admitting the challenged photographs.

■ Finally, Trout contends that the district court abused its discretion by admitting a pipe and a bong that the agents found in Laughlin's house. Like the pictures of Laughlin smoking marijuana, this evidence added nothing to the resolution of any disputed factual issue in this case and should not have been admitted. Nevertheless, the district court's decision to admit them similarly amounted to harmless error because this evidence was also cumulative to Laughlin's wife's testimony that her husband used drugs for recreational purposes. That Trout, not Laughlin, raised this issue on appeal strengthens our conclusion that the admission of the pipe and the bong found in Laughlin's house was harmless error with respect to Trout.

### IV. Impeachment of Laughlin's Wife

Both defendants complain that the district court abused its discretion by permitting the Government to impeach Laughlin's

wife's testimony through the testimony of a rebuttal witness. On cross-examination, and without objection, the Government asked Laughlin's wife, "Did you ever tell Special Agent Damian Stites that Ed Kish was the source of cocaine for Tim Laughlin?" She responded, "No, I did not." In rebuttal, and over defendants' objections, Agent Stites took the stand and testified that, when Mrs. Laughlin was at the Richland County Sheriff Department trying to arrange for her husband's release after his arrest, she told him that Ed Kish was the source of her husband's cocaine.

■ Defendants claim that the court erred in permitting Stites to impeach Mrs. Laughlin's testimony because her testimony addressed a collateral matter for which she could not be impeached by contradiction. Under the decisions of this court, "a witness may not be impeached by a contradiction on collateral matters elicited on cross-examination." *United States v. Carter,* 720 F.2d 941, 949 (7th Cir.1983) (quoting *United States v. Harris,* 542 F.2d 1283, 1306–07 (7th Cir.1976)). Under this test, this court must determine whether the district court abused its discretion, *see United States v. Covelli,* 738 F.2d 847, 856 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 211, 83 L.Ed.2d 141, in determining that Mrs. Laughlin's testimony regarding the source of her husband's cocaine related to a non-collateral matter. According to this court, a matter is not collateral if it could "be shown in evidence for any purpose independent of the contradiction." *United States v. Harris,* 542 F.2d at 1306–07. *See also United States v. Jarrett,* 705 F.2d 198, 207 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984).

■ This court finds that the district court did not abuse its discretion in determining that Mrs. Laughlin's testimony about her husband's source of cocaine did not constitute a collateral matter. She testified that her husband rarely used drugs since they were married. According to Mrs. Laughlin, Laughlin occasionally would use drugs recreationally if his friends brought drugs to their house. In light of this testimony, the Government was enti-

tled to explore whether Mrs. Laughlin had said that Ed Kish was the source of her husband's cocaine, whether her husband and Kish were friends, and whether Kish ever visited their house. If Mrs. Laughlin testified that Kish was not a friend of Laughlin's who visited their house, then her statement that Kish was her husband's source is relevant to undermine her testimony that Laughlin only used drugs if friends brought them to their house. Accordingly, the district court did not abuse its discretion in determining that Mrs. Laughlin's statement about her husband's source of cocaine addressed a non-collateral matter on which she could be impeached by contradiction.

### V. Relevance of Trout's Statement that He Did Not Overhear Conversation

■■ Laughlin's final challenge to the district court's evidentiary rulings is that the court abused its discretion in failing to permit Trout to testify that he did not overhear a statement that Laughlin allegedly made while Laughlin, Trout, and Worthall were in jail following their arrests. In the Government's case-in-chief, Worthall testified that, when they were in jail following their arrests, Laughlin told Worthall that he had $7,000 in a coat pocket that the agents failed to discover when they searched his house. When Trout took the stand, Laughlin's attorney attempted to ask him whether he overheard the statement that Worthall attributed to Laughlin. At this point, the Government objected on the ground that the question called for hearsay, and the court sustained the objection.

After the defense rested and prior to closing arguments, Laughlin made an offer of proof regarding what Trout would have said had he been permitted to answer the question. According to defendant's offer of proof, Trout would have testified that, because the three of them were alone in a jail cell, he would have overheard any statements Laughlin made to Worthall and that he did not overhear the alleged statement. At the time defendant made his offer of proof, the court stated that it had sustained the Government's objection be-

cause Trout's testimony that he did not overhear Laughlin's statement was not probative of whether or not Laughlin actually made the statement.

Under rule 801(c) of the Federal Rules of Evidence, Trout's testimony that he did not overhear a certain conversation does not amount to hearsay. Fed.R.Evid. 801(c). Rule 801(c) defines hearsay as a *"statement ... offered in evidence to prove the truth of the matter asserted."* Fed.R.Evid. 801(c) (emphasis added). Here, Trout would not have testified to any statement that he made or any statement that he overheard. Rather, he would have testified that he did not *hear* the alleged statement. Accordingly, rule 801(c) does not operate as a bar to his proposed testimony.

As previously set forth, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action *more probable or less probable than it would be without the evidence."* Fed.R.Evid. 401 (emphasis added). Of course, a trial court possesses broad discretion to assess the relevance of proffered evidence, and its decision on the issue of relevancy will not be overturned on appeal absent a clear abuse of discretion. *United States v. Bouye,* 688 F.2d 471, 476 (7th Cir.1982); *United States v. West,* 670 F.2d 675, 682 (7th Cir.1982), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2972, 73 L.Ed. 2d 1359. Nevertheless, this court finds that the district court abused its discretion in this case by foreclosing Trout from testifying that he did not overhear Laughlin make the alleged statement. Assuming that Trout would have testified that he was in a position to overhear any statements that Laughlin made to Worthall, his testimony that he did not overhear Laughlin's alleged statement is clearly relevant. After hearing Trout's testimony, of course, the jury would have been free to give the testimony whatever weight the jury determined that it deserved, considering Worthall's contradictory testimony and Trout's obvious self-interest in denying that he overheard the statement.

Although the district court abused its discretion by foreclosing Trout from testi-

fying that he did not hear Laughlin's alleged statement, such an abuse of discretion does not amount to an error requiring reversal if it is a harmless error. Fed.R. Crim.P. 52(a). On the basis of the evidence introduced at trial, this court finds that this error was harmless "since it would not have likely changed the result of the trial." *United States v. Perez-Leon,* 757 F.2d 866, 876 (7th Cir.1985). The Government's evidence, consisting of Worthall's testimony that he arranged the cocaine transaction through Laughlin and that Laughlin was the source of his cocaine, the testimony of various agents that Laughlin was present during the sale of cocaine that occurred on February 9th, and the incriminating evidence found in Laughlin's house, is overwhelming evidence supporting Laughlin's conviction. Whether or not Laughlin said in the cell that he had $7000 in his pocket would appear to have little bearing on the criminal transactions with which he was charged which were overwhelmingly independently proved.

### VI. Conclusion

For the foregoing reasons, the convictions of defendants Laughlin and Trout are AFFIRMED.

Easterbrook, Circuit Judge, filed concurring opinion.