THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BRAD LIEBERMAN, Defendant-Appellant.

First District (2nd Division)    No. 80-2690

Opinion filed June 29, 1982.

Mary Robinson and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Paula Carstensen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant, Brad Lieberman, was found guilty by a jury of the offense of rape and was sentenced to an extended term of 50 years imprisonment. Defendant raises as issues on appeal whether: he was denied due process by the State's inquiry into and comment upon his post-arrest failure to disclose his alibi; he was denied a fair trial by certain evidentiary rulings of the trial court; the trial court's response to an emotional outburst by a prosecution witness was prejudicial; the substitution of an alternate juror for a juror on the final day of trial was error; the State's closing argument denied him a fair trial; he was proved guilty of rape beyond a reasonable doubt; and the 50-year extended term imposed upon him was proper.

The victim testified to the following facts. On December 17, 1979, at about 11:30 a.m., as she was checking her lobby mailbox, a man, 6′2″ tall, 210 pounds, light brown hair and wearing a maroon windbreaker with the name "Wilson" written across the chest, blue jeans and a blue T-shirt, approached her. She identified him as defendant. He flashed a badge inside a wallet, said he was a policeman and a part-time plumber employed by her building, and told her that there was a leak in her apartment he needed to get to. They both went upstairs to her apartment

where the victim told him about some of the plumbing problems she had been experiencing. While defendant toured the apartment looking for leaks she observed his face. Defendant went into her bedroom, looked in the closet and told her that the closet would have to be emptied so he could get to the leak. She answered the telephone and told the caller, her roommate, Maria Hemzo, that there was a plumber in the apartment and she would call back. Defendant told her that he had to find his crew and left. He returned 3 minutes later and said that they would have to empty out the closet.

As she started emptying the closet, defendant grabbed her from behind, put a knife up against her throat and told her not to struggle or he would kill her. He told her what was going to happen and not to do anything or she would be hurt. He said that he had to cut up another girl before so that she should just relax and it will be all over. He had her pull down the window shades, take off her clothes, lie on the bed, and close her eyes, occasionally threatening to kill her if she did not obey. She started crying, and said "please go, please leave." He put his mouth to her vagina and then had intercourse with her. She opened her eyes and had a "very good" look at his face. He told her he would come back and cut her up with a knife if she were to call the police.

She was with defendant for a total of about one-half hour. Defendant did not try shielding his face from her until he got into bed. People's exhibit No. 8 was identified as the black leather case and silver star defendant flashed to her in the lobby. She did not recall whether there was also a picture in the wallet. Right after the incident, when she spoke with the police, she could not remember whether it was a badge or shield. People's exhibit No. 9 looked like the knife defendant wielded. She told the police after the incident that the weapon was a "long metallic pointed object" but did not use the word "knife".

After a few minutes, she telephoned her roommate and said that she had been raped by the plumber. Later, she was examined at the St. Francis Hospital in Evanston. It was stipulated between the State and the defense that an extracted vaginal smear indicated the presence of sperm.

On January 4, 1980, she identified defendant as her assailant in a lineup. At trial there was no question in her mind that defendant was the man who raped her.

The testimony of Maria Hemzo, the victim's roommate, concerning the substance of her interaction with the victim on the day of the incident was substantially consistent with the victim's testimony.

Three other witnesses testified without objection about incidents involving defendant occurring on various days, September 12, 1979, November 16, 1979, and December 10, 1979. In each incident defendant: approached the witness near her residence; asked each if she lived in or

owned the building; and held himself out to be a plumber. In two of the incidents, the witnesses believed defendant's representation and allowed him to come into their apartments. Once inside, defendant told them that the bedroom closet would have to be emptied to fix the leak. As the witnesses began to remove clothes from the closet, defendant grabbed their throats from behind, told them to take off their clothes, to close their eyes, and to relax. One witness stated that defendant had a knife like People's exhibit No. 9 in his hand. Defendant had nonconsenting intercourse with each of them. Both witnesses identified defendant as their assailant at a pretrial lineup. In the third instance, the witness told defendant that she was the owner of the building and that no plumbing work needed to be done. Defendant left. She described defendant to police as white, in his early twenties or 25, sandy brown hair, 200 pounds, about 6′2″, and clean shaven.

Ernest Halvorsen, the investigating police officer, stated that the third witness described the suspect as being between 25 to 27 years, 6′1″ or 6′2″, 190-200 pounds, and having light brown, neatly trimmed hair. After speaking with the third witness, he and his partner stopped defendant in his car. Defendant told him that: he was living with his father in Skokie; he was in the area to visit a friend named Mike who was the manager of the Jewel on Morse; and at one time he worked as a security guard at a nearby Community Store. The officers let defendant proceed. The next day, Halvorsen received a composite photograph that resembled defendant. Thereafter, he and his partner went to the Morse Avenue Jewel, but discovered that no employee there was named "Mike." Two weeks later, defendant was apprehended and placed into custody.

Evidence was adduced showing that a steak knife, identified as People's exhibit No. 9, was found underneath the driver's seat of a car registered to defendant's father but driven on occasion by defendant. In the center console of the car, three badges and a badge holder were found: one was issued by Lutheran General Hospital, another was a patrolman's star, and the third was a silver star in a black leather wallet.

Defendant's mother testified that on December 17, 1979, her son was at her home in Des Plaines from about 10:10 a.m. to 1:40 p.m. at which time her son went to work. On September 12, 1979, defendant arrived at her home for dinner at about 2:30 p.m. and stayed until about 6:30 p.m. People's exhibit No. 21, a badge and identification card inside a folded wallet, looked like it belonged to her son. Neither one of the other two resembled his badges.

Defendant's fiancee stated that on December 16, 1979, defendant spent the night at her apartment. The next morning at about 10 a.m. they left in separate cars. Defendant went to his mother's house.

Defendant, age 20, stated that he had never been inside the victim's

apartment and that he did not rape her. Defendant did not rape or converse with the other two women who claimed he raped them. On November 16, 1979, the day of one of the alleged rapes, he was at his fiancee's apartment and later in the afternoon he went to work at Lutheran General Hospital. When shown a time card from this hospital, he stated that he "apparently" did not work that day. He did not see or speak with the third witness on December 10, 1979. The knife found in his car was used to repair speaker wires. He used the "Crosstown Security" badge found in his car when he worked at Marshall Field's.

## I

Defendant contends that the State's cross-examination of his failure to disclose his alibi to the police after his arrest and comment on that silence during final argument constituted reversible error, relying upon *Doyle v. Ohio* (1976), 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245, and *People v. Green* (1979), 74 Ill. 2d 444, 386, N.E.2d 272. In each it was held that the constitution forbids the prosecution from using evidence of a defendant's post-arrest silence for purposes of impeaching an exculpatory alibi offered at trial. Defendant assigns error to the following cross-examination:

"Q. [State's Attorney]: Did you tell them that you were with your mother on the 17th, yes or no?

A. [Defendant]: No.

Q. Did you tell them you were with anybody on November the 16th when * * * [another named person] was raped?

A. No.

Q. Did you tell them that you were with anybody on September the 12th when * * * [still another named person] was raped?

A. No, I didn't."

In closing argument the State made the following comment:

"You heard Mr. Haddad [State's Attorney] ask him [defendant] questions, did you tell the police you were with your mother on December the 17th, 1979? No. That's where he says he was today, ladies and gentlemen. Did he tell the police when he was severely questioned, according to him? Absolutely not, absolutely not."

The State concedes that the cross-examination and closing argument on defendant's post-arrest silence violated *Doyle*, but contends that the issue was waived. It argues, in the alternative, that the error was harmless.

The issue of plain error in the context of a *Doyle* violation was recently addressed by the Illinois Supreme Court in *People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091, which was concerned with the effect of the prosecutor's closing argument that Lucas had failed to assert his claim of self-defense at the time of his arrest. The court there held that the

plain error rule could not be invoked, since the evidence was not closely balanced.

■■ The evidence pointing to defendant's guilt in the present case is strong. The victim had a good opportunity to observe him up close for an extended period of time during the incident. Her claim that she had been raped was corroborated by her prompt call minutes after the incident to her roommate and by the extracted vaginal smear. Her testimony was corroborated by the discovery of a badge, wallet and knife inside defendant's car. The description of the assailant approximated that of defendant. Defendant was identified as the assailant by the victim at a pretrial lineup and at trial. Defendant's identity and *modus operandi* was substantially corroborated by the testimony of three other women who positively identified him at a pretrial lineup or at trial or both. In contrast, defendant's credibility was undermined with respect to the incident of November 16, 1979. On that date, defendant stated he was at his fiancee's apartment in the morning, went to get a haircut, and then proceeded to work at Lutheran General Hospital, in the afternoon. When shown a time card from Lutheran General Hospital on cross-examination, defendant conceded that "apparently" he did not work that day. One must conclude from the foregoing that the State's improper comments and examination concerning defendant's post-arrest silence were harmless beyond a reasonable doubt (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824), and did not contribute to defendant's conviction. *People v. Beller* (1979), 74 Ill. 2d 514, 526, 386 N.E.2d 857.

## II

Defendant next contends that the prejudicial effect created by witnesses testifying to two other rapes and one assault for which he had not been convicted, outweighed any probative value resulting from admission of that testimony. No objection to the admission of the "other crimes" evidence was made at trial by defendant nor was it identified as error in his post-trial motion. Accordingly, this argument has been waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Nevertheless, this issue will be examined for the purpose of determining whether or not to apply the plain error rule to these circumstances. *People v. McMillan* (1970), 130 Ill. App. 2d 633, 264 N.E.2d 554.

■■ Evidence of other crimes is admissible to show knowledge, intent, motive, design, plan or identity (*People v. Armstrong* (1968), 41 Ill. 2d 390, 398, 243 N.E.2d 825), provided its probative value and need outweighs its prejudicial effect. (*People v. Triplett* (1981), 99 Ill. App. 3d 1077, 425 N.E.2d 1236.) In view of the striking similarities between the three other crimes and the instant offense, and the strong eyewitness

testimony that the other crimes were committed by defendant, this evidence was highly probative on the issue of *modus operandi* and identity. (McCormick, Evidence sec. 190 (2d ed. 1972).) Defendant claims prejudice because, with the other crimes evidence, he was no longer on trial for one rape but for others as well; however, the decision of whether to admit or exclude such testimony is within the sound discretion of the trial court. (*People v. Johnson* (1981), 97 Ill. App. 3d 1055, 1068, 423 N.E.2d 1206.) No such abuse of discretion is evident in the present case. The State's eyewitness testimony and corroborating physical evidence was contradicted by defendant's alibi defense; identity and *modus operandi* of the assailant was therefore in question and the State clearly had a need to present evidence probative and relevant to these issues.

## III

■■ Also under attack is the submission of the State's Jury Instruction Number 9, Illinois Pattern Jury Instructions, Criminal, No. 3.14 (1968) (hereinafter IPI Criminal), which provided:

> "Evidence has been received that the defendant has been involved in crimes other than that charged in the indictment. This evidence has been received solely on the issue of the defendant's identification—presence—intent—motive—design—knowledge. This evidence is to be considered by you only for the limited purpose for which it was received."

Defendant contends that the submitted instruction: (1) erroneously used the term "crimes" insofar as the defendant had not been convicted of any crime in relation to the acts described by the three prosecution witnesses, and (2) was overly broad since "presence, intent, motive, design and knowledge" were not at issue. In *People v. Richards* (1978), 64 Ill. App. 3d 472, 474, 381 N.E.2d 307, the court held that the use of the term "crimes" in the instruction was improper. As the dissent in that case observed, however, the use of this word did not necessarily imply that defendant was convicted of these crimes. The word "offense" would have been better suited under such circumstances, and has been so used. (See *People v. Weathers* (1974), 23 Ill. App. 3d 907, 320 N.E.2d 442, *rev'd on other grounds* (1975), 62 Ill. 2d 114.) IPI Criminal, No. 3.14 (2d ed. 1981), which became effective in 1981, is now so phrased. Further, the use of this jury instruction without modification was erroneous, since it was overly broad. (*People v. Weathers.*) As was held in *Weathers*, however, and in view of the strong evidence of defendant's guilt as presented to the jury in the instant case, it cannot be said that articulation of the objectionable words in this instruction could have influenced the outcome of the jury's decision, and we decline to reverse on this ground.

## IV

■■ Relying on *People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223, defendant urges that he should have been allowed to impeach a prosecution witness by the use of an "Identi-kit" sketch prepared by that witness and an artist. In *Rogers* it was held that an authenticated composite sketch was admissible for purposes of corroborating a witness' identification testimony where the sketch was based upon a description provided by such witness. *People v. Tyllas* (1981), 96 Ill. App. 3d 1, 420 N.E.2d 625, extended the *Rogers* holding to sketches admitted to impeach the identification testimony. (Accord, *People v. Brown* (1981), 100 Ill. App. 3d 57, 70, 426 N.E.2d 575.) It is evident from the record, however, that the witness in the present case could not remember what the sketch looked like. It is also unclear from the record as to whether the sketch was ever displayed to her. Assuming, *arguendo*, that the sketch could have been properly authenticated and should have been received in evidence, the error, if any, was harmless in view of the forceful evidence against defendant.

## V

■■ Next defendant assigns error to the trial court's reaction to an incident alleged to have occurred while the court was in chambers. Defense counsel reported to the court that a prosecution witness started crying and was helped out of the courtroom. In defendant's post-trial motion, defendant further alleged that this witness also uttered words to the effect that she "could not take it any more." The trial court admonished the jury that prejudice and sympathy should have no bearing in the outcome of the trial and to arrive at a conclusion based on the evidence from the witness stand. Defendant insists that the court abused its discretion in failing to examine the courtroom personnel in chambers or poll the jurors individually. This assertion lacks merit. Any prejudice to defendant resulting from the incident was cured by the trial court's admonition. Defendant also urges that the court erred in not excluding previous witnesses still in courtroom after the incident. Since no other "outbursts" occurred, manifestly the court's decision in this regard did not prejudice the rights of defendant.

## VI

■■ Defendant claims next that the trial court's dismissal of a juror without conducting a sufficient, on-record inquiry was prejudicial to him. On the morning of the last day of trial, the deputy sheriff testified that he had received a phone call from one of the jurors, who told him that she was intoxicated. The deputy stated that she sounded like she was intoxicated. At a subsequent proceeding, the trial court recalled that he spoke with the

juror by telephone and detected a slurred voice on the end of the line. The first alternate juror was selected to replace her. At the hearing on defendant's post-trial motion, defense counsel stated that the caller told the deputy sheriff that she couldn't make up her mind and for that reason got intoxicated. Assuming, *arguendo*, that the juror was drinking due to her indecision in the case, the trial court did not abuse its discretion in finding her incapacitated and unable to serve as a juror. (*People v. Thomas* (1979), 71 Ill. App. 3d 838, 390 N.E.2d 414.) The first alternate juror had been selected during *voir dire*, sat through the entire trial, and was fully qualified to serve as a juror. Defendant contends that he was denied "the right to have an undecided juror involved in the deliberations" and the "right to have a juror who would have voted for a verdict of not guilty," but does not explain how he could conclude that the juror would have voted for a verdict of not guilty after hearing the remaining evidence and deliberating with other jurors. How this juror ultimately would have voted could not have been determined by an on-the-record examination. No error is found here.

## VII

■■ Defendant maintains that he was prejudiced by certain comments made by one of the prosecutors during closing argument, as follows:

"MR. ANGAROLA [State's Attorney]: Ladies and gentlemen, there is one thing about the case that there is no testimony on, but it may be something you are thinking about.

MR. WINN [Defense attorney]: Objection, Your Honor. I'm going to object to any remark not in evidence.

THE COURT: The objection will be sustained.

MR. ANGAROLA: Ladies and gentlemen, you saw [defendant's fiancee] * * * testify. She is a nice young lady, apparently pregnant. There is a question. Why would this man who is apparently enjoying a sexual relationship rape anyone. That is the sublety [*sic*] that is supposed to flow across to you, ladies and gentlemen.

Well, ladies and gentlemen, there is a basic misconception about what a rape is. The basic misconception is that rape is a crime of sexual gratification. It is not true, ladies and gentlemen. That is not what rape is all about.

MR. WINN: Objection, Your Honor.

THE COURT: As to what rape is the objection to the last portion is sustained.

MR. ANGAROLA: Ladies and gentlemen, rape is a crime of violence. It is a crime of violence against women. It is a method of degrading women. I am sure—

MR. WINN: Objection, Your Honor.

THE COURT: You may proceed. The objection is overruled.

MR. ANGAROLA: It is an act of degrading [*sic*]. That is what this man did. That is what this overgrown coward did. And I call him that, ladies and gentlemen, \* \* \*."

Defendant maintains that these comments were improper since they were made solely to inflame the passions of the jury. Generally, improper remarks do not constitute reversible error unless it can be said that an accused was substantially prejudiced by them. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) In light of the overwhelming evidence of defendant's guilt, we cannot say that the remarks, even if deemed improper, were prejudicial.

Defendant maintains that the following remark during closing argument violated the rule that the prosecutor may not accuse defendant's attorney of fabricating evidence:

"MR. ANGAROLA: \* \* \* Think back about what he [defense counsel] told you about his case [during opening statements] and about what he told you he would prove. He didn't even mention to you the defendant was going to say he was with his mother on that day. He didn't even mention that.

Why? Because, ladies and gentlemen, that defense was made up as the case went along. He couldn't stand up here in front of you and tell you that because he wasn't quite sure exactly what he was going to do. He was going to lay back in the weeds so to speak. Let's see how the State's case goes first and then we'll decide what's happening.

Well, he decided in the middle of the case—

MR. WINN: I'm going to object as to what my motives are.

THE COURT: This is merely an inference. The jury understands they have a reasonable inference from the evidence and they heard the evidence. They will only consider the evidence from the witnesses in arriving at their verdict, whatever their verdict may be. Proceed."

This comment was clearly improper. (*People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19; *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.) The only question is whether it's prejudicial error. In view of the convincing evidence of defendant's guilt in this case, we hold that it is not, as we hold with respect to other comments of the State of which defendant complains.

## VIII

The evidence adduced at trial manifestly proved defendant guilty

beyond a reasonable doubt. Defendant's argument to the contrary is entirely without merit and warrants no further discussion than has already been set forth above.

## IX

■■ The 50-year extended sentence is next challenged as improper under section 5—5—3.2(b)(1), (2) of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(1), (2)), since he had neither a prior "conviction" as defined by statute nor was the offense accomplished by exceptionally brutal or heinous behavior indicative of wanton cruelty. At the sentencing hearing on October 14, 1980, the prosecution presented a certified copy of a half sheet from the Lake County Circuit Court indicating that on October 3, 1980, defendant was found guilty of rape, robbery and intimidation. At the time of the sentencing hearing in the instant case, the Lake County case had not yet proceeded to the sentencing phase. Since no sentence had been imposed in Lake County, defendant argues, that case could not have been deemed a "conviction" for purposes of applying the extended term, citing sections 5—1—5 and 5—1—12 of the Code. (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—1—5 and 1005—1—12.) We are compelled to agree that at the time of sentencing, no "judgment of conviction" had yet been entered against defendant, as those terms are defined by the Code sections above cited. (See *People v. Robinson* (1980), 84 Ill. App. 3d 916, 920, 406 N.E.2d 153.) Accordingly, no section 5—5—3.2(b)(1) basis existed for imposition of an extended term of 50 years, and such sentence must be vacated and the cause remanded for resentencing. The other basis for an extended term provided for by section 5—5—3.2(b)(2), "exceptionally brutal or heinous behavior indicative of wanton cruelty," is also absent from these facts. Compare *People v. Turner* (1981), 93 Ill. App. 3d 61, 416 N.E.2d 1149, and *People v. Gray* (1979), 80 Ill. App. 3d 213, 399 N.E.2d 206, with *People v. Clark* (1981), 102 Ill. App. 3d 414, 429 N.E.2d 1255. See also *People v. La Pointe* (1981), 88 Ill. 2d 482, 499-501, 431 N.E.2d 344.

Because defendant's last argument with respect to sentencing may again arise at the resentencing proceeding, we shall give it consideration here.

■■ Defendant urges that the sentence was a product of the court's consideration and reliance upon evidence of other rapes and assaults upon women for which defendant had neither been charged nor convicted. The State contends that the trial court properly reviewed this testimony, relying primarily on *People v. La Pointe*. In *La Pointe*, the supreme court considered a similar argument and decided that a trial court may "properly receive proof of criminal conduct for which no prosecution and conviction ensued," with caution and sensitivity to possibilities of preju-

dice to defendant. (88 Ill. 2d 482, 499.) We find neither prejudice nor error in the present case as to this issue.

For the aforesaid reasons, we affirm defendant's conviction, vacate the sentence imposed and remand for a new sentencing hearing.

Affirmed; sentence vacated and remanded.

DOWNING and PERLIN, JJ., concur.