**Brad J. LIEBERMAN, Petitioner–Appellant,**

v.

**Odie WASHINGTON, Warden of Dixon Correctional Center and Howard A. Peters, III, Director of Illinois Department of Corrections, Respondents–Appellees.**

Nos. 95–3179, 95–3194.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1997.

Decided Oct. 27, 1997.

Joshua Sachs (argued), Chicago, IL, for Petitioner–Appellant.

Arleen C. Anderson, Terence Madsen, Robert K. Villa (argued), Office of the Attorney General, Chicago, IL, for Respondents–Appellees in No. 95–3179.

Rita M. Novak, Robert K. Villa (argued), Office of the Attorney General, Chicago, IL, for Respondent–Appellee in No. 95–3194.

Before POSNER, Chief Judge, COFFEY and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

Petitioner-appellant Brad Lieberman ("Lieberman") was charged with rape and convicted on September 22, 1980, following a jury trial in Cook County, Illinois. In a separate case arising in Lake County, Illinois, he was charged with the offenses of robbery, intimidation, and rape, and convicted by a Lake County jury on November 14, 1980.[1] The Illinois Court of Appeals affirmed Lieberman's Lake County convictions in an unpublished order, and his Cook County conviction was affirmed by the Illinois Court of Appeals in *People v. Lieberman*, 107 Ill.App.3d 949, 63 Ill.Dec. 585, 438 N.E.2d 516 (1982). Lieberman filed petitions to appeal each of the Lake County convictions, as well as his Cook County conviction, to the Illinois Supreme Court, but it declined to review either case.

After exhausting his state law post-conviction remedies in each case, Lieberman filed separate *pro se* habeas corpus petitions with the district court in 1993, pursuant to 28 U.S.C. § 2254. The judge appointed separate counsel to represent Lieberman in the presentation of each of his two petitions, and

---

1. At the time of the defendant's convictions, this crime was designated as "rape." Effective July 1, 1984, the statute was repealed and recodified and the offense was renamed as "criminal sexual assault." Throughout this opinion the terms "rape" and "sexual assault" will be used synonymously.

thereafter both of the appointed attorneys filed separate amended petitions individually challenging Lieberman's Lake County and Cook County convictions. These petitions were consolidated on motion of the respondents. After briefing and oral argument, the court dismissed both petitions on August 24, 1995, without holding an evidentiary hearing. The trial judge concluded that, in light of the overwhelming evidence supporting both the Cook County conviction and the Lake County convictions, Lieberman was not entitled to a writ of habeas corpus in either case. Lieberman appeals. We affirm.

## I. BACKGROUND

### A. The Lake County Convictions

The victim, a female exchange student, testified that on May 5, 1980, at approximately 3:15 p.m., a white male came to the door of the Highland Park (Lake County), Illinois home at which she resided with her host family. That man, whom the victim later identified as Lieberman, asked her if she was home alone and if anyone else who lived in the house might know what had happened to his automobile, claiming that it had been damaged while parked on the street. When the victim replied that no one else was present and that she knew nothing about his car, Lieberman requested and received permission to enter the house, and also asked if he could leave his phone number in case someone later provided information regarding the alleged damage to his vehicle. After entering the home and engaging in a brief conversation, Lieberman grabbed the victim by the neck, hit her, forcibly pushed her up the stairs and into a bedroom, and sexually assaulted her, thereafter binding her hands with a cord. At trial, the victim testified that she heard him rummaging through her dresser drawers and that, subsequent to his departure, she noticed approximately $180–200 in cash was missing from a dresser drawer. The victim further stated that she was able to see her assailant clearly during the encounter,[2] describing him as a white male

approximately twenty-five years old, over six feet tall with a slight mustache and a muscular build, and wearing light sunglasses. On the evening of the incident, she identified Lieberman from a photographic lineup of six men, and later made an in-court identification of him as the man who had sexually assaulted her.

Matthew Adler, the son of the family who owned the home where the victim was staying, testified that as he was returning from school around 3:15 p.m. on the day of the assault he observed a man (whom he later identified as Lieberman) leaving his house. Matthew watched the man pass within three or four feet of him, enter a brown Camaro parked about ten feet away, and drive off. He described this man as a white male with broad shoulders in his late twenties. Immediately thereafter, Matthew entered the Adler home, whereupon he heard the victim crying and found her in an upstairs hallway attempting to untie her hands, and promptly called the police.

Adler's friend, David Schaefer, who was with Adler at 3:15 p.m. on the date of the assault, testified at trial that he saw a man leave Adler's home and run from the family's driveway. He described the individual as a white male, approximately six feet tall, in his mid-twenties, with a heavy build. Schaefer explained that he observed the man get into a car, and at that time recited the license plate number aloud. Shortly after entering the house, he wrote down the license number of the vehicle that he and Michael Adler had seen. This information—the license plate number and automobile description—was later relayed to the police. David eventually identified Lieberman at trial as the man he saw enter the car and drive away.

The defendant Lieberman, matching the description provided by Matthew and David, was "picked up" later that day driving a brown Camaro which carried the same license plate number as that one the two boys had reported earlier. The petitioner was subsequently arrested and the Camaro,

---

2. The victim observed her assailant for approximately fifteen to twenty minutes, having initially seen him and spoken with him in the lighted kitchen of her host-family's home. After her

assailant forced her to the bedroom, the victim continued to look at him until she was ordered to close her eyes.

owned by his girlfriend, was impounded. During an ensuing search of the car, $135 in cash was found underneath a rear floor mat. Upon being questioned, Lieberman had no explanation for the presence of the money. A pair of light sunglasses were also found in the Camaro, which the victim later identified as those worn by her assailant.

At trial, Lieberman offered an alibi in the Lake County assault incident, testifying that he was not present at the crime scene at the time of the alleged sexual assault, but rather was having his girlfriend's Camaro repaired at Golf Road Firestone, a service station in DesPlaines, Illinois. Petitioner testified that the station provided a work receipt with the time 3:30 p.m. inscribed thereon. He stated that he later gave this receipt to his girlfriend who, in turn, delivered it to his mother, Harriette Lieberman ("Harriette"). Petitioner further testified that, while being detained at the Highland Park Police Station on the evening of May 5, he contacted his mother to "[m]ake sure those people [at the service station] kn[e]w [he] was at the service station at 3:30." [3] Harriette also appeared as a witness at trial to corroborate her son's alibi. She was prepared to explain that Petitioner had telephoned her from the DesPlaines gas station at 3:35 p.m. on May 5, asking whether she had some cash with which to pay for the repairs to his girlfriend's vehicle.[4]

Lieberman's alibi conflicted with the timing and substance of those events which took place at the Golf Road Firestone on May 5, as recounted by station employee, Victor Breckler ("Breckler, Jr."). Breckler, Jr. testified that, as he was departing from work at 4:00 p.m. on May 5, he noticed Lieberman *pull up* to the bay doors of the service station. He went on to explain that "there was *never* a time put on [Petitioner's work ticket]

when the job was done," and that, on the morning of May 6, 1980, Harriette Lieberman visited the Golf Road Firestone, requesting that "a paper [be] filled out stating that he [Lieberman] had the car there for service at 3:30 [the previous day]...." Breckler, Jr. refused to make such a statement because he "knew that the car was not there at 3:30," and suggested that Harriette speak with his father, Victor Breckler ("Breckler, Sr."), who owned the Golf Road Firestone at the time. Harriette approached Breckler, Sr. and urged him to make a written statement that her son, Brad, was at the service station as early as 3:00 p.m. on May 5, but he at first refused to do so. Because Harriette continued to "giv[e][him] a bit of a difficult time" and he "tr[ies] to be kind to people if [he] can," Breckler, Sr. eventually gave in to her demand and wrote on Petitioner's ticket from the previous day, "Mr Lieberman was at station and went to Wag's Deli for coffee while car was being taken care of between 3:30 and 4:45." Breckler, Sr. had previously testified, however, that he in fact "[did]n't know exactly what time [the Camaro] got there [the Golf Road Firestone]" on May 5, and that he first "saw it [at] approximately 4:00 o'clock."

## B. Cook County Conviction

The facts relevant to Lieberman's Cook County conviction were recited in detail in the state appellate court's opinion in *Lieberman*, 63 Ill.Dec. 585, 438 N.E.2d 516, and are not disputed by the petitioner.[5] The victim testified that on December 17, 1979, at about 11:30 a.m., she was checking her mailbox in the lobby of her apartment building on the City of Chicago's north side. She was approached by a white male (Lieberman), standing over six feet tall and weighing more

---

3. Specifically, the Assistant State's Attorney asked Lieberman whether he made the statement, "Make sure that those people know I was at the service station at 3:30," to his mother. Petitioner responded that the statement was "vaguely close" to what he had said.

4. Lieberman's counsel attempted to elicit this testimony from Harriette Lieberman, but the State made a timely hearsay objection, which the court sustained. Nevertheless, the trial judge did allow counsel to make an offer of proof as to

Harriette's anticipated testimony regarding the content of the alleged telephone conversation between herself and petitioner. Harriette was, however, permitted to explain to the jury that she received a call (without recounting the subject matter thereof) from Lieberman at 3:35 p.m.

5. Indeed, Lieberman's appellate brief draws its own summary of the facts from the state court's opinion.

than 200 pounds. He flashed some sort of a badge inside a black wallet-type case and claimed to be an off-duty police officer who was also employed as a plumber for the building. When the petitioner told her that there was "a leak" in her apartment that needed repair, the victim acquiesced and allowed Lieberman to enter her apartment. Once inside the apartment, Lieberman walked through a number of rooms, and while he was on his tour of the apartment, the victim got a good look at his face. After peering into her closet, Lieberman told the victim that it would have to be emptied so he could begin to work on the plumbing. The petitioner left for a few minutes and, upon his return, the victim began emptying out her closet. As she did so, Lieberman grabbed her from behind, held a knife to her throat, and told her that if she struggled he would kill her. He added that he had previously "cut up" another girl and that she should just close her eyes, take her clothes off, and relax. He directed the victim to lie on her bed and he proceeded to sexually assault her. The victim stated that during the assault, she opened her eyes and got a "very good" look at Lieberman's face. The petitioner fled the victim's apartment at approximately 12:00 p.m., one-half hour after he had first approached her in the lobby.

Approximately five minutes after the assailant left the apartment, the victim telephoned her roommate and told her about the attack. A short while later, the victim was examined at a hospital, where tests revealed evidence of recent sexual intercourse. On January 4, 1980, eighteen days after the assault, the victim identified Lieberman as her assailant in a lineup. At trial, she again identified the defendant as her assailant.

Three other women testified at trial: one stated that Lieberman had attempted to assault her on December 10, 1979; the other two testified that he did in fact sexually assault them on September 12, 1979, and November 16, 1979, respectively, employing a *modus operandi* similar to the one he was accused of using on December 17, 1979. On each of the three previous occasions, Lieberman approached the women in their respective apartment buildings and identified himself as a plumber, claiming that he needed to make repairs in their apartments (he twice claimed to be working for Peterson Plumbing Company, a non-existent entity). In the two instances on September 12 and November 16, the women believed Lieberman and allowed him entry into their apartment, whereupon he asked them to remove their belongings from their bedroom closets in order that he might repair alleged water leaks. In each case, while the women were emptying their closets, as Lieberman had requested, he grabbed his victims from behind, around the neck, and directed them to close their eyes, take off their clothes and relax. He would then proceed to criminally assault them. The two women assaulted in this fashion later identified Lieberman in a police lineup. The intended victim of Lieberman's third assault in Cook County, which took place on December 10, 1979, owned the building to which petitioner claimed to have been sent by the owner to repair. When she explained to Lieberman that she was the owner of the building and that she had never called for a plumber, he walked away. Immediately after this encounter, she notified the police and described the suspect as a "very tall large white man, early 20's, sandy-brown hair, about 200 pounds, six foot two, clean shaven."

The evidence at trial also included three "badges"[6] removed from the red and white Pontiac LeMans that Lieberman was driving just prior to the time of his apprehension.[7] One of the badges was encased in a leather wallet. The victim of the assault for which Lieberman was being tried testified that the badge and the wallet looked similar to the one Lieberman displayed to her on December 17. A steak knife was also found in the car the defendant had been driving, which the victim testified resembled the knife Lieberman had in his possession when he

---

6. Of the three "badges" found in the vehicle Lieberman was driving, one was described at trial as a "star," another as a security badge from Lutheran General Hospital, and the third as "a patrolman's star for a security firm."

7. The vehicle was owned by, and registered to, petitioner's father, Sy Lieberman.

threatened her and subsequently committed the assault. One of Lieberman's previous assault victims also testified that the knife exhibited at trial looked like the knife the assailant (Lieberman) had wielded when he committed the sexual assault upon her.

Lieberman, testifying in his own defense at his Cook County trial, claimed that he was with his mother on the date and at the very time the victim stated she had been attacked. He further asserted that, on November 16, 1979, the date of one of the earlier assaults, he had spent the afternoon working at his job at Lutheran General Hospital. However, when Lieberman was shown a time card at trial from the hospital which established that he had *not* been at work on that date, he equivocated, stating that he "apparently" did not work that day. He explained the presence of the knife in his car by stating that he had previously used the knife to repair speaker wire from the car's stereo. Lieberman's mother testified on behalf of her son as an alibi witness, stating that on December 17, 1979, the defendant was with her at her house in suburban Chicago at the time of the rape. Obviously, the jury chose to disregard the alibi testimony of the defendant and his mother.

## II. ISSUES

The appellant claims that the district court erred when it denied his petitions for habeas relief, asserting that: (1) in the Lake County case, the prosecution's failure to disclose to the defense fingerprints discovered in the home where the rape occurred denied him due process of law; (2) the prosecutor in the Cook County case violated his constitutional due process rights by improperly questioning him during cross-examination concerning his failure to provide police with the alibi he offered at trial and by improperly referring to this post-arrest silence in closing remarks;

and (3) additional closing remarks by the prosecutor in the Cook County proceedings were likewise prejudicial and served to deny him the due process right to a fair trial.

## III. DISCUSSION

### A. Standard of Review

In 1996, Congress enacted The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"), which, *inter alia*, "add[ed] to the existing habeas statute a new § 2254(d) ... prescrib[ing] the appropriate treatment of *legal* determinations made by a state court." *Sweeney v. Parke*, 113 F.3d 716, 718 (7th Cir.1997) (emphasis added).[8] At the close of its most recent term, the United States Supreme Court, reversing an *en banc* decision of this Court, held that the provisions of amended § 2254(d) do *not* apply with respect to habeas petitions "in noncapital cases that were ... pending when the Act was passed." *Lindh v. Murphy*, —— U.S. ——, ——, 117 S.Ct. 2059, 2061, 138 L.Ed.2d 481 (1997).

Lieberman's petitions were filed in 1993 and pending at the time of the AEDPA's enactment. Thus, consistent with the *Lindh* ruling, we apply the standards prevailing *prior* to the 1996 amendments to § 2254 in reviewing the denial of habeas relief by the district court. These standards provide that: " '[w]hen considering a district court's decision to grant or deny a petition for a writ of habeas corpus, we review questions of law *de novo*,' while factual determinations made by the state trial and appellate courts are considered 'presumptively correct.' " *Jones v. Page*, 76 F.3d 831, 834 (7th Cir.1996) (quoting *Rodriguez v. Peters*, 63 F.3d 546, 554 (7th Cir.1995)). Because Lieberman does not challenge the state courts' factual findings, we limit our review to the question of whether, in light of the facts in each of the peti-

---

8. Specifically, revised § 2254(d) provides:
 An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
 (1) resulted in a decision that was *contrary to, or involved an unreasonable application*

of, *clearly established Federal law*, as determined by the Supreme Court of the United States; or
 (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
 28 U.S.C. § 2254(d) (emphasis added).

tions before it, the district court properly denied habeas relief as a matter of law. *See Brewer v. Aiken,* 935 F.2d 850, 854–55 (7th Cir.1991) (habeas jurisdiction of this Court under § 2254 extends only to violations of federal statutory or constitutional law).

### B. Lake County Case: Failure of Prosecution to Disclose Fingerprint Evidence

■ Approximately two years after his convictions for rape, robbery and intimidation in Lake County, Lieberman learned, while serving his prison term, that a police officer investigating the Lake County crime had lifted seventeen sets of fingerprints from the scene of the assault (victim's residence) and that the prosecuting attorney had failed to turn them over to him in response to a discovery order "to turn over scientific tests." The state appellate court[9] found that the fingerprints were taken from areas "suspected to [have been] touched by the offender," and that while three or four of the prints were identified as belonging to someone who had lived in the household, the remaining prints were determined to have come from unidentified sources. Lieberman argues that the failure to turn over this evidence constituted a violation of his right to due process as articulated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ We recently had occasion to review the requirements of *Brady* and its progeny in *United States v. Hamilton,* 107 F.3d 499 (7th Cir.1997):

> *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), requires that the government provide a defendant with exculpatory evidence within the government's knowledge or control "where the evidence is material either to guilt or to punishment," irrespective of the prosecutor's good or bad faith.... Nondisclosure of *material* exculpatory evidence ... violates a defendant's due process right to a fair trial. *See [United*

States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985)]. Evidence is material to the defense if there is a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* at 682, 105 S.Ct. at 3383–84 and 473 U.S. at 685, 105 S.Ct. at 3385; *United States v. Kozinski,* 16 F.3d 795, 818 (7th Cir.1994). A "reasonable probability" is that sufficient to undermine confidence in the outcome. *Id. The materiality standard is not met by "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial...."* *United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).

107 F.3d at 509 (emphasis added). Thus, *Brady* does not require a prosecutor to divulge every scintilla of evidence that might conceivably inure to a defendant's benefit. *Id.* (citing *Smith v. Secretary of New Mexico Dept. of Corrections,* 50 F.3d 801, 823 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 272, 133 L.Ed.2d 193 (1995)).

The petitioner claims that the state's failure to disclose the existence of the fingerprint evidence lifted from the premises and areas known or thought to have been touched by the assailant prevented him from effectively challenging the prosecution's case. Because none of the fingerprints lifted belonged to the petitioner, and only three or four belonged to members of the household with the others unidentified, the petitioner argues this would have been "material" evidence for the jury to consider. The district court considered and properly rejected this argument in light of *Brady*'s materiality standard, as set forth by the Supreme Court in *U.S. v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and *U.S. v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The district judge reviewing Lieberman's habeas' petition reasoned that the lack of fingerprints left by the defendant and

---

9. While the petitioner did not learn of the fingerprint evidence until approximately two years after his conviction, there was ample time for him to raise the issue in his second petition for state post-conviction relief, filed on March 24, 1984, as well as in his two supplemental petitions thereto. The denial of the March 24 petition was affirmed by the state appellate court in an unpublished order dated April 17, 1986.

the presence of other unidentified prints at the crime scene was "not unusual,"[10] and concluded that because of the other, overwhelming evidence of Lieberman's guilt, there was "no reasonable probability that the result of the trial would have been different" had the fingerprint evidence been introduced. Similarly, the state appellate court concluded earlier that the fingerprint evidence "would not have materially helped [Lieberman] in his defense," when considered in the context of the entire record, i.e., the "overwhelming" evidence of his culpability.

We agree with the district court and the Illinois appellate court that in light of the wealth of evidence of Lieberman's guilt, there is no "reasonable probability" that this evidence could possibly have made a difference in the outcome of the defendant's Lake County trial. The victim in the Lake County case testified that she observed Lieberman's face when he came to the door of the home where she was staying, and that she could clearly see the assailant before and during the assault. Furthermore, she was able to identify him on two separate occasions: in a lineup and at trial. She described the assailant as a white male, muscular build, about 6 feet tall, 25 years old, with a slight mustache, and wearing light sunglasses. The victim testified that, after raping and tying her up, the assailant asked her where her money was and began opening drawers. After his departure she discovered $180 to $200 had been stolen from her bedroom drawer. In addition to the victim's identification of Lieberman, two young male witnesses identified the petitioner as the man they saw on the date and at the time of the incident in the victim's front yard moving quickly away from the house in the direction of a parked car. Both of these witnesses gave a description of the man. One witness described this man as a white male with sandy brown hair in his late twenties. The other witness described him as a white male, approximately six feet tall, dirty blond hair, 24 years old, and of heavy build. The two witnesses also reported the type of car he entered and had the presence of mind to record the license plate number,

which assisted the police in apprehending Lieberman several hours after the rape. The light sunglasses identified by the victim as being worn by her assailant were found in the vehicle, as was $135 in cash found under the floor mat. Upon questioning, the petitioner was unable to offer any explanation for the money found in the vehicle.

Finally, Lieberman's purported alibi testimony regarding his presence at Golf Road Firestone, a service station, at the time the sexual assault occurred was not corroborated by the employees at the gas station. In fact, these employees testified that the time reflected on the receipt was not in their handwriting, and that Lieberman's mother, Harriette, had visited the station the day after the rape to try to convince them to state that Lieberman was at the station at 3:30 p.m. on the day of the rape. Initially, Harriette urged Breckler, Sr., the owner of Golf Road Firestone, to make a written statement that petitioner was at the service station as early as 3:00 p.m. on May 5, but he refused to do so. Breckler, Sr. explained at trial that because Harriette continued to "giv[e][him] a bit of a difficult time" concerning the requested alteration of the worksheet and to the extent that he "tr[ies] to be kind to people if [he] can," he eventually gave in to her demand and wrote on the ticket, "Mr Lieberman was at station and went to Wag's Deli for coffee while car was being taken care of between 3:30 and 4:45." However, just moments earlier Breckler, Sr. had testified that he in fact "[did]n't know exactly what time [the Camaro] got there [the Golf Road Firestone]" on May 5, and that he first "saw it [at] approximately 4:00 o'clock."

Although we do not approve of the state prosecutor's failure to turn over requested evidence after a proper and timely request, we agree with the district court that, in light of the overwhelming evidence of Lieberman's guilt presented during the Lake County trial, there is no "reasonable probability" that the trial would have turned out differently had this evidence been provided to the defense in a timely fashion. As the Supreme Court

---

**10.** As the respondents note in their brief, "[a]ny number of people have legitimate social or service reasons to visit a residence, and could leave unidentifiable fingerprints while doing so." Resp. Br. at p. 7.

stated in *Agurs*, "[the] mere *possibility* that an item of undisclosed information *might* have ... affected the outcome of the trial does not establish 'materiality' in the constitutional sense." 427 U.S. at 109–10, 96 S.Ct. at 2400–01 (emphasis added). Because the fingerprint evidence that the prosecutor failed to relinquish was not "material" as that term is defined in *Brady* and its progeny, the withholding of this evidence (even though improper) does not rise to the level of a constitutional violation. *Id.*; *see also U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. With respect to the issue of the fingerprint evidence in the Lake County case, we thus hold that the district court's denial of habeas relief was proper.

### C. Cook County Case: Prosecutor's Use of Lieberman's Post–Arrest Silence to Undermine His Alibi Testimony

With respect to his Cook County conviction, Lieberman challenges as unconstitutional the prosecution's use of his post-arrest silence to undermine his alibi testimony. Lieberman testified that he was with his mother at her house at the time the rape occurred. On cross-examination, the prosecutor asked Lieberman whether he had told the police officers who arrested him about this alleged alibi. Lieberman's counsel raised, and the court sustained, a timely objection as to the "form of the question" asked. The prosecutor thereafter rephrased the question and Lieberman responded, without further explanation, that he had not informed the police of his alibi at the time he was taken into custody or during subsequent questioning.[11]

11. The record reveals that the following colloquy occurred during cross-examination of Lieberman at his Cook County trial:

BY MR. HADDAD [Assistant State's Attorney]:
Q You mentioned that you were severely questioned in the police station the night of your arrest, is that correct?
A Uh, yes.
Q And, of course, you told Officer Miller and Halvorsen that you were with your mother on December 17th, didn't you?
MR. WINN [Lieberman's counsel]: Objection, your Honor.
MR. HADDAD: Didn't you?
MR. WINN: To the form of the question.

During final arguments, the state's attorney again challenged Lieberman's purported alibi by making reference to his post-arrest silence:

> You saw the defendant's slickness when he testified. He told you also about [being] severely questioned. He told you he denied this and [defense counsel] stood up here and yelled nine or ten times about how he denied it. You heard [the state's attorney] ask him questions, did you tell the police you were with your mother on December the 17th, 1979? No. That's where he says he was today, ladies and gentlemen. Did he tell the police when he was severely questioned, according to him? Absolutely not, absolutely not.

Lieberman's counsel failed to object altogether to the above-quoted closing remarks.

Lieberman maintains that these questions and statements made by the prosecutor concerning his failure to divulge his alleged alibi to police were constitutionally impermissible under the Supreme Court's decision in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The Court in *Doyle* held that it is a violation of due process for a prosecutor "to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings." *Id.* at 611, 96 S.Ct. at 2241 (citing in footnote *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966)); *see also United States v. Scott*, 47 F.3d 904, 906 (7th Cir. 1995).

The Appellate Court of Illinois noted in Lieberman's direct appeal that "[t]he State

THE COURT: As to the form—as to the form of the question, the objection will be sustained. You may rephrase it.
BY MR. HADDAD
Q Did you tell them that you were with your mother on the 17th, yes or no?
A No.
Q Did you tell them you were with anybody on November the 16th when [Lieberman's second victim] was raped?
A No.
Q Did you tell them that you were with anybody on September the 12th when [Lieberman's first victim] was raped?
A No, I didn't.

concedes that the cross-examination and closing argument on defendant's post-arrest silence violated *Doyle, but contends that the issue was waived.* It argues, in the alternative, that the error was harmless." *Lieberman,* 63 Ill.Dec. at 589, 438 N.E.2d at 520 (emphasis added). For reasons unknown, the court chose to ignore the State's waiver argument, and proceeded on to conclude that the "improper comments and examination concerning defendant's post-arrest silence were harmless beyond a reasonable doubt and did not contribute to defendant's conviction." *Id.* (citations omitted). We, however, have reason to believe that Lieberman did in fact waive his *Doyle* argument on appeal, and as such, shall begin our analysis there.

■ It is axiomatic that, "[t]o preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection." *United States v. Wynn,* 845 F.2d 1439, 1442 (7th Cir.1988) (citing *United States v. Laughlin,* 772 F.2d 1382, 1391–92 (7th Cir.1985)). *"Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review." Id.* (emphasis added) (citing *Laughlin,* 772 F.2d at 1392). These principles are not cast aside simply because a constitutional right might otherwise be lost. *See Laughlin,* 772 F.2d at 1391; *People v. Lucas,* 88 Ill.2d 245, 58 Ill.Dec. 840, 430 N.E.2d 1091 (Ill.1981). In the present case, Lieberman's attorney objected to the "form of the question"—that is, he made a specific objection-during the State's questioning of petitioner as to his post-*Miranda* silence. This was clearly a different ground than that upon which Lieberman now bases his appeal (i.e., an alleged *Doyle* violation). Petitioner also allowed the State's closing remarks regarding his post-*Miranda* silence to pass without objection. Because the trial judge was never called upon to rule whether the State's cross-examination and/or closing statements were violative of *Doyle,* Lieberman waived this argument on appeal unless "plain error" is manifest. *See United States v. Whaley,* 830 F.2d 1469, 1478 (7th Cir.1987).

■ As just noted, "[i]ssues that have not been properly preserved for appeal must be reviewed under the strict standards of the plain error doctrine ... which allows appellate courts to correct only 'particularly egregious errors' for the purpose of preventing a miscarriage of justice." *Id.* We will find plain error in the event that there is apparent "an actual miscarriage of justice, which implies the conviction of one who but for the error would have been acquitted." *United States v. Silverstein,* 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). Under such a deferential standard, it should come as little surprise that *reversal for plain error is exercised in only the most exceptional of circumstances. United States v. Jackson,* 542 F.2d 403, 409 (7th Cir.1976). This certainly is not one of those "exceptional circumstances" wherein it was absolutely necessary for the prosecutor to have introduced inadmissible evidence or made improper statements to obtain a conviction. The abundance of evidence proffered at trial, including, among other things, the victim's in-court identification of Lieberman, the badge and weapon used in perpetrating the crime, as well as the testimony of three other women whom the defendant had earlier assaulted or attempted to assault using a similar *modus operandi,* overwhelmingly points to the petitioner's guilt. Had the State neither engaged in the line of questioning nor made the statements which Lieberman now challenges, would the result of the trial have been different? Not by any stretch of the imagination.

This Court in no way endorses the State's improper cross-examination and closing remarks regarding Lieberman's post-*Miranda* silence. They were the exact tactics that *Doyle* explicitly prohibits and which a trial judge, *upon proper objection,* would be expected to forbid. While the state prosecutor should have known better than to have referenced Lieberman's "protected" silence, whether on cross-examination or during closing arguments, he did so, and petitioner's counsel either failed to object on *Doyle* grounds or did not object at all, thereby waiving the argument on appeal. In sum, upon reviewing for plain error, we do not believe that the entire proceeding was so infected with impropriety that, but for the

*Doyle* violation, the jury would have acquitted, rather than convicted, Lieberman.

 Nevertheless, even assuming for the sake of argument that Lieberman preserved his *Doyle* argument for appeal and that a *Doyle* violation *did* in fact occur, we agree with the district court that habeas relief is not proper since the purported *Doyle* violation was harmless under the standard set forth by the Supreme Court in *Brecht,* at 623–25, 113 S.Ct. at 1714, which the parties agree is applicable here.[12] Under this standard, our habeas review is limited to the question of "whether the *Doyle* error 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see also* Kappos v. Hanks, 54 F.3d 365, 369 (7th Cir.1995). We consider the impact of the alleged *Doyle* violation "in light of the record as a whole[.]" *Brecht,* at 637–39, 113 S.Ct. at 1722; *see also O'Neal v. McAninch,* 513 U.S. 432, 436–38, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995) (stating that in "the special circumstance in which *record review* leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict" the judge should issue writ of habeas corpus) (emphasis added).

We agree with the district court's conclusion that in light of the "overwhelming evidence" of Lieberman's guilt in the Cook County case, the alleged *Doyle* violation could not have had a "substantial and injurious effect or influence in determining the jury's verdict." Once again, as the district court observed, the evidence against the petitioner included the eyewitness testimony of the victim, who testified that she had a "very good" look at her assailant's face and identified Lieberman in court, along with the badge and the weapon used in perpetrating the crime. Furthermore, as the district judge also noted, "[a]t the time of the inci-

dent [the victim] made a prompt outcry and was examined medically, which revealed the presence of sperm in her vagina." The evidence against Lieberman also included the testimony of three other women whom the defendant had assaulted or attempted to assault, all of whom testified that he had employed a similar *modus operandi* on each occasion. *See United States v. Gant,* 17 F.3d 935, 944 (7th Cir.1994) (*Doyle* violation harmless beyond reasonable doubt where government "presented a very strong case that [defendant] was guilty of the charges"). We further note, as did the Illinois appellate court, that the defendant's own testimony may have weighed against him, for his credibility was certainly undermined when the prosecution introduced physical evidence (i.e., timesheets) which refuted his sworn testimony that he had been working at the Lutheran General Hospital at the time of one of the previous sexual assault incidents. Finally, the references by the state's attorney to Lieberman's post-arrest silence, while not insubstantial, were hardly egregious or repeated enough for us to conclude that they affected the jury's verdict. *See Scott,* 47 F.3d at 907 (*Doyle* error harmless where references to postarrest silence "were limited in their intensity and frequency"). Indeed, it would be disingenuous at best to suggest that the disputed closing remark tainted the entire proceeding's integrity and constituted a due process violation when one considers that it comprised only ten out of almost thirteen-thousand lines of transcript generated from testimony given over a six-day trial. In sum, considering the prosecutor's remarks in light of the overwhelming evidence of Lieberman's guilt, we concur with the district court that if a *Doyle* violation did occur, it was harmless under *Brecht.*

### D. Cook County Case: Other Aspects of Prosecution's Closing Argument

 Lieberman's final contention is that other comments made by the state's attorney during closing argument in the Cook County case were improper and resulted in a denial

---

12. As Justice Stevens explained in his *Brecht* concurrence, the standard for habeas review of a *Doyle* violation "is less stringent than the standard applied on direct review," which is set forth in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Illinois appellate court, applying *Chapman's* more rigorous

standard, concluded from its review of the evidence that *"the State's improper comments and examination concerning defendant's post-arrest silence were harmless beyond a reasonable doubt." Lieberman,* 63 Ill.Dec. at 589–90, 438 N.E.2d at 520–21 (emphasis added).

of his due process right to a fair trial. Specifically, Lieberman points to the following two passages of the state's closing argument:

[State's Attorney]: * * * Think back about what he [defense counsel] told you about his case [during opening statements] and about what he told you he would prove. He didn't even mention to you the defendant was going to say he was with his mother on that day. He didn't even mention that.

Why? Because, ladies and gentlemen, that defense was made up as the case went along. He couldn't stand up here in front of you and tell you that because he wasn't quite sure exactly what he was going to do. He was going to lay in the weeds so to speak. Let's see how the State's case goes first and then we'll decide what's happening. Well, he decided in the middle of the case—

[Defense Attorney]: I'm going to object as to what my motives are.

THE COURT: This is merely an inference. The jury understands they have a reasonable inference from the evidence and they heard the evidence. They will only consider the evidence from the witnesses in arriving at their verdict, whatever their verdict may be. Proceed.

Later during his summation, the state's attorney again made comments to which Lieberman's counsel objected:

[State's Attorney]: Ladies and gentlemen, there is one thing about the case that there is no testimony on, but it may be something you are thinking about.

[Defense Attorney]: Objection, your Honor. I'm going to object to any remark not in evidence.

THE COURT: The objection will be sustained.

[State's Attorney]: Ladies and gentlemen, you saw [defendant's fiancee] * * * testify. She is a nice young lady, apparently pregnant. There is a question. Why would this man who is apparently enjoying a sexual relationship rape anyone. That is the sublety [sic] that is supposed to flow across to you, ladies and gentlemen.

Well, ladies and gentlemen, there is a basic misconception about what a rape is. The basic misconception is that rape is a crime of sexual gratification. It is not true, ladies and gentlemen. That is not what rape is all about.

[Defense Attorney]: Objection, your Honor.

THE COURT: As to what rape is the objection to the last portion is sustained.

[State's Attorney]: Ladies and gentlemen, rape is a crime of violence. It is a crime of violence against women. It is a method of degrading women. I am sure—

[Defense Attorney]: Objection, Your Honor.

THE COURT: You may proceed. The objection is overruled.

[State's Attorney]: It is an act of degrading [sic]. That is what this man did. That is what this overgrown coward did. And I call him that, ladies and gentlemen....

Lieberman claims that these comments, which he characterizes as examples of "improper prosecutorial conduct," challenged the very core of his alibi defense, as well as denied him his due process right to a fair trial.

 "In reviewing an allegation of prosecutorial misconduct we ask whether the misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Stewart v. Duckworth*, 93 F.3d 262, 267 (7th Cir.1996) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)). "[It] is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471. Rather, they must be "so serious that [they] poison[ ] the entire atmosphere of the trial." *United States v. Pirovolos*, 844 F.2d 415, 425 (7th Cir.1988). "The fairness of the trial in *its entirety* is to be examined to determine whether the prosecutor's statements violated due process." *Shepard v. Lane*, 818 F.2d 615, 621 (7th Cir.1987) (emphasis added) (citing *United States ex rel. Crist v. Lane*, 745 F.2d 476, 482 (7th Cir.1984)). " 'The most important factor to be considered in determining whether the closing statement violated [the defendant's] rights is ... the proof of ... guilt....

[S]trong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations.' " *Rodriguez v. Peters,* 63 F.3d 546, 558 (7th Cir.1995) (quoting *United States v. Gonzalez,* 933 F.2d 417, 431–32 (7th Cir.1991)).

■■■■ Although Illinois law gives prosecutors considerable leeway in presenting their closing arguments to a jury, *see, e.g., People v. Wright,* 27 Ill.2d 497, 190 N.E.2d 287, 289 (1963), the Illinois court of appeals determined that the closing remarks at issue here concerning counsel's alleged fabrication of evidence were in fact improper, and failed to render an opinion as to the comment concerning pregnancy. Nevertheless, the court analyzed each of the allegedly objectionable passages quoted above and concluded ·that in light of the "overwhelming evidence" against Lieberman, these remarks were not prejudicial.[13] Similarly, the district court determined that the "strong" and "compelling" evidence of Lieberman's guilt (reviewed in some detail above) " 'eliminate[d] any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations.' " (quoting *United States v. Young,* 470 U.S. 1, 19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985)). Moreover, as the district judge noted, the "comparative brevity" of the prosecutor's remarks made it difficult to conclude that they " 'so infect[ed] the trial with unfairness' as to deny petitioner due process." (quoting *Darden,* 477 U.S. at 182, 106 S.Ct. at 2472 (1986)). As we discussed in the previous section, the evidence that Lieberman committed the rape was "overwhelming." Thus, we agree with the district court that the petitioner is not entitled to habeas relief on the basis of the prosecutor's remarks, as ill-advised and uncalled for as they may have been, during closing argument. Neither the state court nor petitioner in his brief to this Court explains how or why the pregnancy comment is objectionable. To the extent that the prosecutor may have suggested that sexual assault is motivated by sexual desire and not .violence, we agree with the state court that his comments were improper. As one of our colleagues on this Court recently observed, "[r]ape and sexual assault are generally understood today not as sexual acts borne of attraction, but as acts of violent aggression that stem from the perpetrator's power over and .desire to harm his victim." *Angoucheva v. I.N.S.,* 106 F.3d 781, 792 n. 2 (Rovner, J., concurring) (citing extensive authorities).

## IV. CONCLUSION

To summarize, we hold that in ·light of the overwhelming evidence of guilt presented in both the Lake and Cook County proceedings, the petitioner Lieberman was not prejudiced by any of the errors which he alleges occurred therein. The district court's denial of Lieberman's habeas petitions is therefore

AFFIRMED.

---

**13.** Claims of prosecutorial misconduct, like *Doyle* claims, can be reviewed under harmless-error analysis. *Pirovolos,* 844 F.2d at 425 (citing *Chapman*). *See also Thompson .v. Borg,* 74 F.3d 1571, 1576–77 (9th Cir.1996) (citing *Brecht* and *O'Neal*).